[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-14476

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 26, 2010
JOHN LEY
CLERK

D.C. Docket No. 3:97-cv-00559-HES

In re:

CARY MICHAEL LAMBRIX,

Petitioner.

_____

Application for Leave to File a Second or Successive
Habeas Corpus Petition, 28 U.S.C. § 2244(b)

_____

Before TJOFLAT, CARNES and HULL, Circuit Judges.

BY THE COURT:

## I.  PROCEDURAL HISTORY

Cary Michael Lambrix was convicted of two counts of first-degree murder

and received two death sentences in Florida state court for his February 5, 1983

murders of Clarence Moore and Aleisha Bryant.  Lambrix's convictions and death

sentences were affirmed on direct appeal.  Lambrix v. State, 494 So. 2d 1143 (Fla.

1986).  Lambrix filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, which the state trial court denied.  In 1988, the Florida Supreme Court, in separate opinions, affirmed the denial of Lambrix's Rule 3.850 motion and denied Lambrix's state habeas petition.  See Lambrix v. State, 534 So. 2d 1151 (Fla. 1988) (affirming denial of Rule 3.850 motion); Lambrix v. Dugger, 529 So. 2d 1110 (Fla. 1988) (denying state habeas petition).

Also in 1988, Lambrix filed in federal district court a 28 U.S.C. § 2254 petition for a writ of habeas corpus raising 28 claims.  The district court denied Lambrix's § 2254 petition, and this Court affirmed.  Lambrix v. Singletary, 72 F.3d 1500 (11th Cir. 1996).  The United States Supreme Court affirmed this Court's judgment.  Lambrix v. Singletary, 520 U.S. 518, 117 S. Ct. 1517 (1997).

Lambrix has also filed four successive state motions for postconviction relief.  The Florida Supreme Court has thrice affirmed the state trial court's denial of Lambrix's successive postconviction motions.  See Lambrix v. State, 39 So. 3d 260 (Fla. 2010); Lambrix v. State, 698 So. 2d 247 (Fla. 1996); Lambrix v. State, 559 So. 2d 1137 (Fla. 1990).[1]  On April 8, 2009, Lambrix filed a fourth successive state motion for postconviction relief, which the state trial court denied in July

---

[1]The Florida Supreme Court also denied a successive state habeas petition Lambrix filed pursuant to this Court's directive in Lambrix v. Singletary, 72 F.3d 1500.  Lambrix v. Singletary, 641 So. 2d 847, 847 (Fla. 1994).

2010. Lambrix's appeal to the Florida Supreme Court is pending. Lambrix v. State, No. SC10-1845 (Fla.) (appeal docketed Sept. 28, 2010).

Lambrix has now applied to this Court for leave to file a second or successive § 2254 federal habeas petition. In his Application, Lambrix requests that we issue an order authorizing him to file in the district court 12 claims that he alleges are new claims. Lambrix must allege they are new because § 2244(b) prohibits state court prisoners from filing in a second or successive habeas petition claims that have been raised already in a prior petition. See 28 U.S.C. § 2244(b)(1) ("A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.").

Even if some of Lambrix's 12 claims are new, we cannot grant Lambrix's Application as to any new claim unless:

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(A)-(B). Section 2244 was enacted in its current form as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which "was designed, among other reasons, to bring some finality and certainty to the seemingly never-ending collateral attack process." In re Davis, 565 F.3d 810, 817 (11th Cir. 2009).

Lambrix does not invoke the § 2244(b)(2)(A) exception, but proceeds solely under subpart (B). Thus, to obtain leave to file a second or successive petition, he must make a "prima facie showing" of compliance with § 2244(b)(2)(B). 28 U.S.C. § 2244(b)(3)(C). And to comply with § 2244(b)(2)(B), Lambrix must show that both (1) the factual predicate for the claim could not have been discovered previously through due diligence, and (2) the facts underlying the claim establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found Lambrix guilty. Id. § 2244(b)(2)(B)(i)-(ii).

## II. FACTUAL BACKGROUND

We briefly summarize the facts surrounding the murders and Lambrix's prosecution. A fuller discussion can be found in Lambrix v. State, 494 So. 2d 1143 (Fla. 1986).

On February 5, 1983, Lambrix and his girlfriend, Frances Smith, met victims Clarence Moore and Aleisha Bryant at a local tavern. Smith, who was the

State's key witness at Lambrix's trial, testified that after leaving the tavern, Lambrix, Smith, Moore, and Bryant returned to Lambrix and Smith's trailer for dinner. Lambrix went outside with Moore, returned alone twenty minutes later, and asked Bryant to go outside with him. Lambrix again returned alone and was carrying a bloody tire iron. The evidence showed Lambrix killed Moore and Bryant in brutal fashion. Lambrix told Smith that he choked and stomped on Bryant and hit Moore over the head with the tire iron. Lambrix and Smith ate dinner, washed up, and then borrowed a shovel from Moore's neighbor John Chezem. They then buried the bodies in shallow graves and took Moore's Cadillac and disposed of the tire iron and Lambrix's bloody shirt in a nearby stream.

Frances Smith was arrested three days later on unrelated charges. Following her release, Smith advised law enforcement authorities about the murders. On February 26, 1983, during the ensuing investigation, Smith led police to the buried bodies, the tire iron, and Lambrix's bloody shirt. The bulk of the damaging evidence at Lambrix's trial was given by Smith, but her story was corroborated by the physical evidence – i.e., the bodies, tire iron, and Lambrix's bloody shirt. Other witnesses corroborated different parts of her testimony, such as Chezem's testimony that Lambrix and Smith borrowed the shovel. Witnesses

Preston Branch and Deborah Hanzel testified that Lambrix told them he killed Moore and Bryant.

Lambrix's first trial ended in a mistrial. At Lambrix's second trial, the jury convicted Lambrix of two counts of first-degree murder and recommended two death sentences, which the state trial court imposed. Lambrix's execution was originally scheduled for November 30, 1988 but later was stayed periodically. The multiple state and federal postconviction proceedings have lasted over two decades.

### III. CLAIMS RAISED IN LAMBRIX'S FIRST § 2254 PETITION

Before reviewing the 12 claims Lambrix seeks to file in a successive petition, it is helpful to review the robust nature and number of claims Lambrix raised in his first § 2254 petition.

Lambrix's first § 2254 petition, filed in 1988, raised 24 numbered and four additional unnumbered claims, including but not limited to these claims: (1) denial of Lambrix's right to testify; (2) denial of individualized voir dire; (3) error in refusing to change the venue; (4) Brady claim that witness Frances Smith had allegedly entered into a "deal" with the State in exchange for her testimony, which deal was never disclosed to the defense; (5) improper restriction of the cross-examination of witness Frances Smith with respect to alleged prior inconsistent

6

statements made to law enforcement upon her own arrest and improper restriction of cross-examination of witness Connie Smith; (6) despite Lambrix having committed these murders while a fugitive, the trial court improperly admitted testimony regarding Lambrix's escape from the correctional center where he was serving a two-year sentence; (7) ineffective assistance by psychiatrist Dr. William Whitman; (8) ineffective assistance of trial counsel for failure to supplement and renew the change of venue and individualized voir dire motions; (9) ineffective assistance by trial counsel's failure to adequately cross-examine and impeach State witnesses John Chezem, Preston Branch and Deborah Hanzel; (10) ineffective assistance by trial counsel's failure to properly object and exclude the testimony of State witness Deborah Hanzel; (11) ineffective assistance of trial counsel on multiple other grounds during the guilt phase; (12) ineffective assistance of trial counsel on multiple grounds during the penalty phase, including inadequate investigation and presentation of mitigation evidence; (13) improper jury instructions during the penalty phase; (14) refusal to give a voluntary intoxication instruction; (15) trial judge's finding of five aggravating circumstances and no mitigating circumstances; (16) ineffective assistance of appellate counsel for failure to raise various claims on direct appeal and for not adequately presenting certain claims that were raised on direct appeal; (17) the

sentencing court made miscellaneous erroneous rulings and instructions which deprived Lambrix of a fair and reliable sentencing proceeding; (18) the sentencing court erred in allowing impermissible victim impact evidence; and (19) after Lambrix's first trial ended in a mistrial, the Double Jeopardy Clause barred his second trial.[2]

After a five-day evidentiary hearing, the district court in 1992 issued a 72-page order denying Lambrix's first § 2254 petition. On January 3, 1996, this Court affirmed. Lambrix v. Singletary, 72 F.3d 1500 (11th Cir. 1996). The United States Supreme Court granted certiorari on one issue and affirmed. Lambrix v. Singletary, 520 U.S. 518, 117 S. Ct. 1517 (1997).

## IV. ADMISSIONS IN LAMBRIX'S APPLICATION

Before discussing the specific claims in Lambrix's Application to file a successive petition, we point out several factual admissions in his Application because those facts, as we explain later, vitiate certain claims in his Application.

Notably, in his handwritten Application, Lambrix admits to (1) being with his girlfriend Frances Smith and the two victims at the tavern on the night of the

---

[2]We compiled this partial list of § 2254 claims from Lambrix's first § 2254 petition, the district court's 12 May 1992 order denying Lambrix's first § 2254 petition, and this Court's decision affirming the district court's denial of § 2254 relief. Lambrix v. Singletary, 72 F.3d 1500 (11th Cir. 1996).

murders, (2) then going with them to his and Smith's trailer, (3) going inside the trailer with them, (4) then going outside the trailer while Moore and Bryant were also outside the trailer, (5) grabbing the tire iron and hitting Moore with the tire iron, killing Moore, and (6) then going back inside the trailer and telling Smith "they're dead." We quote some of the relevant portions of Lambrix's Application wherein Lambrix makes various admissions in the form of outlining what his trial testimony would have been if he had testified:

> Petitioner would had [sic] testified that after Petitioner went outside with Moore/Lamberson[3] both Petitioner and Moore/Lamberson decided to play a intoxicated-inspired practical joke on Smith and Bryant. While Moore/Lamberson hid at a nearby cattle feed trough, Petitioner went to ask Smith and Bryant to come out with the intention of having Moore/Lamberson then jump out and scare them.
> However, as the record reflects, Smith stayed inside to finish cooking while only Bryant then accompanied Petitioner outside. . . . As Petitioner and Bryant approached the feed trough, Moore/Lamberson suddenly jumped out, resulting in the desired effect of startling Bryant. But unlike Petitioner and Moore/Lamberson, Bryant was not intoxicated and did not find this practical joke to be funny and immediately began to argue with Moore/Lamberson.
> . . . .
> Petitioner headed back to the trailer, but just before going inside, Petitioner heard a scream coming from the pasture area where Petitioner had left Bryant and Moore/Lamberson. Assuming that they must had [sic] run across an animal or something, Petitioner immediately began going back towards the pasture. As Petitioner passed a vehicle that was up on a car jack from being worked on earlier that day, Petitioner spontaneously grabbed the jack handle/"tire iron" and proceeded to the

---

[3]Moore was also known as Lawrence Lamberson.

9

area where Bryant and Moore/Lamberson were.

. . . .

About 1,000 [sic] back near the rear fence Petitioner suddenly came up on the two—Moore/Lamberson had Bryant pinned on the ground, stradled [sic] over her, and was clearly out of control, violently assaulting Bryant. . . .

Petitioner attempted to push Moore/Lamberson off of Bryant, Moore/Lamberson suddenly sprung up, coming at Petitioner from a crouching position. As he did so, Petitioner instinctively swung the tire iron, and kept swinging until realizing that Moore/Lamberson was down, and no longer a threat.

Petitioner then attempted to assist Bryant. . . . At that time, still believing Bryant to be unconscious, Petitioner attempted to perform CPR on Bryant – and only then realized that Bryant was dead.

Leaving both Bryant and Moore/Lamberson where they were, Petitioner returned to the trailer and told Smith "they're dead."

. . . [I]t was mutually decided that Petitioner and Smith would superfacially [sic] conceal the two bodies, then take Moore/Lamberson's vehicle and abandon it away from the area at a hiway [sic] intersection.

(Emphasis added and omitted). Thus, Lambrix's current claim is that he happened upon the male victim Moore attacking the female victim Bryant, and Lambrix then attacked Moore to save Bryant but both ended up dead. The State, however, points out that Lambrix's theory of innocence has changed over the years.[4]

---

[4]According to the State, before trial Lambrix insisted that he had nothing to do with the deaths of the victims. At trial, his attorneys asserted that one victim was involved in drugs, and suggested an unknown drug dealer arrived on a private airstrip nearby and killed both victims. In his state and federal postconviction proceedings, Lambrix asserted he was intoxicated and could not have formed the necessary premeditation to support his two first-degree murder convictions.

Moreover, Lambrix's current theory (which claims Moore "suddenly sprung up" at Lambrix before Lambrix hit him with the tire iron) is a bit different from his earlier account. In an affidavit dated 25 November 1998, Lambrix stated he struck Moore with the tire iron as Moore hit Bryant and before Moore came toward Lambrix:

Aleisha [Bryant] was lying face-up on the ground with Chip [Moore] on his knees

10

## V. DISCUSSION

As noted above, Lambrix's Application seeks leave to file a successive § 2254 petition to assert 12 claims which he alleges are new. We discuss each claim.

## A. Three Claims Do Not Assert a Constitutional Violation

Section 2244(b)(2)(B)(ii) requires that a successive habeas applicant show that "the facts underlying the claim . . . would be sufficient to establish by clear and convincing evidence that, <u>but for constitutional error</u>, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added). Thus, Lambrix's claims must assert "constitutional error." <u>See</u> <u>In re Schwab</u>, 531 F.3d 1365, 1366-67 (11th Cir. 2008) (concluding a claim did not satisfy § 2244(b)(2)(B)(ii) because, <u>inter alia</u>, it "does not assert a constitutional error, just a change in the opinion of an expert witness").

---

straddled across her stomach. Chip had his hands at her shoulder/neck area and was picking her upper body up and slamming it to the ground.

[] I yelled at Chip to let her up. He turned towards me and told me to get the hell out of his business. He continued to assault Aleisha, and as I got up to them, I struck Chip with the tire iron hard enough to force him off Aleisha and to the ground on the far side.

[] Chip immediately jumped back up at me. I was only a couple feet away and did not have time to back up. As he came up at me, I swung the tire iron at him. In fear, I continued swinging the tire iron wildly until he fell at my feet.

Several of Lambrix's claims do not. Lambrix's Claim 1 asserts that his putative successive habeas petition satisfies the "fundamental miscarriage of justice" exception to procedural default but Lambrix does not allege in Claim 1 an independent constitutional violation. In Claim 11, Lambrix challenges the adequacy of his state postconviction review proceedings and argues that the state-court factual findings are not entitled to a presumption of correctness, but Claim 11 alleges no constitutional error at trial. In Claim 12, Lambrix alleges he is entitled to equitable tolling and he has satisfied the cause-and-prejudice exception to procedural default, but Claim 12 alleges no constitutional error.

As to Claims 1, 11, and 12, Lambrix thus has not made out a prima facie showing that he has satisfied the requirements of § 2244(b)(2)(B)(ii).

## B. Three Claims Raised in Prior § 2254 Petition

These three claims in Lambrix's Application were previously presented in Lambrix's 1988 federal habeas petition and rejected by the district court: Claim 7, concerning Frances Smith's alleged immunity deal; Claim 8, concerning the alleged denial of Lambrix's right to testify at trial, and Claim 10, concerning the alleged denial of Lambrix's right to a fair trial because of restrictions on individual voir dire and the cross-examination of Smith.

Notably, as to Lambrix's right to testify, both the district court and this

12

Court concluded that Lambrix had proffered no evidence to show (1) that Lambrix was coerced into not testifying at his second trial, or (2) that Lambrix's trial counsel did not inform Lambrix of his right to testify at the second trial and that the ultimate decision whether to testify belonged to Lambrix. E.g., Lambrix v. Singletary, 72 F.3d 1500, 1508 (11th Cir. 1996).

As to Frances Smith's testimony, the district court, in denying Lambrix's first federal habeas petition, stated, "[t]his court is unconvinced that Frances Smith ever received any 'deal' from any law enforcement agency with respect to the aiding and abetting charges." The district court also determined that (1) trial counsel was permitted vigorous cross-examination of Smith on this point; and (2) trial counsel effectively painted Smith as self-interested and untruthful for her own purposes. The district court alternatively concluded that even if there had been a "deal" and even if this had been revealed to the jury, Lambrix had not shown a reasonable probability that the outcome would have changed. This Court concluded that Lambrix's claims about Smith's testimony lacked merit. Lambrix v. Singletary, 72 F.3d at 1503 n.3.

Because Claims 7, 8, and 10 were previously presented by Lambrix, they cannot be the basis of a claim for leave to file a successive habeas petition. See 28 U.S.C. § 2244(b)(1).

13

## C.    Claim 4: Alleged Hanzel Recantation

Claim 4 concerns the testimony of Deborah Hanzel, a State witness who testified at trial about a phone call with Lambrix. More specifically, at trial Hanzel testified:

> Q:    And what, if anything, did you say to [Lambrix]?
> A:    Well, I read an article to him in the paper, about them looking for him, and I asked him if it was true and if he killed a guy for the car, and he said that was one of the reasons.

At trial Hanzel also testified that she and her boyfriend, Preston Branch, were in a car with Lambrix on February 12, 1983, when Lambrix offered to show them where Lambrix had killed two people and buried them.

Before reviewing Lambrix's Claim 4 about Hanzel, we review Lambrix's claim about Hanzel in the first § 2254 proceedings and what the district court concluded back then.

In his first § 2254 petition, Lambrix claimed his trial counsel was ineffective for failure to have Hanzel's testimony excluded based on her being an agent for the State and for failure to adequately cross-examine and impeach Hanzel. Lambrix alleged Hanzel was recruited to work as both an agent and a witness for the State prior to her telephone call with Lambrix, that she was questioning him as a State agent, and thus her testimony about the telephone call

14

should be excluded.

The district court found that it was never demonstrated at trial that Hanzel had been recruited to work as an agent of the State. The district court pointed out that despite the fact that Lambrix was permitted an opportunity to prove this claim at the evidentiary hearing, Lambrix presented no evidence and testimony on this point. The district court also pointed out that the fact that Hanzel's telephone calls were traced does not establish that Hanzel was solicited by the State to obtain incriminating information. Rather, a "tap and trace" device was placed on Hanzel's phone in order to determine Lambrix's location in case he called Hanzel.

In any event, the district court also found that the key witness against Lambrix at trial was Frances Smith and that Lambrix had shown no prejudice because Hanzel's testimony was not the significant testimony in the trial. The district court concluded that "[i]n light of the other evidence presented, the result would not have differed had this [Hanzel] testimony been excluded."

In his Application, Lambrix now claims that Hanzel recanted her above testimony in 2003.[5] The state court held two evidentiary hearings regarding Lambrix's Hanzel-recantation claim. At the first evidentiary hearing, Hanzel

---

[5]The State points out that Lambrix's state habeas counsel deposed Hanzel as early as 1998. The State also contends Lambrix did not assert a state postconviction claim based on Hanzel's testimony until 2001.

15

denied that Lambrix admitted killing two people, and testified police officers made her afraid of Lambrix. Hanzel did not deny that the phone call with Lambrix, which she testified about at trial, occurred, but testified she did not remember it. Hanzel also testified Lambrix did tell her about two buried bodies.

On July 9, 2003, the state trial court denied Lambrix's Hanzel-recantation claim. The state trial court found that all Lambrix had shown was that Hanzel did not have a good memory about events 20 years ago, stating:

> The Court has reviewed the transcript of the sworn statement given by Deborah Hanzel before trial, as well as the transcript of her trial testimony. The Court compared those transcripts with the testimony given at this evidentiary hearing. Even when taken in the light most favorable to the Defendant, perhaps all that counsel has proven is that Ms. Hanzel does not now have a very good memory of something that occurred nearly twenty years ago.
>
> For example, Ms. Hanzel recalls today that the Defendant told her about buried bodies, but she now asserts that he did not say anything about killing them. Ms. Hanzel also states that she does not now remember "the phone calls" she received from the Defendant after the crimes were committed (although she testified about them at trial). Ms. Hanzel does not, however, now deny that the calls were placed.
>
> In addition, Ms. Hanzel concedes that she remembers some things, but not others. She allowed that some statements she made which were recorded twenty years ago did not refresh her recollection, while at the same time asserting that she does not "recollect" that the Defendant confessed to the killings.
>
> Upon evaluation of the testimony of Ms. Hanzel (and the other two witnesses who testified at the hearing), it is apparent that perhaps the only thing Ms. Hanzel knows for certain at this time is that twenty years ago she believed Mr. Lambrix killed two people and buried their bodies behind a trailer in Glades County, but now she does not.

> At no time during this proceeding did Ms. Hanzel repudiate her prior testimony or otherwise acknowledge that she did not tell the truth at any time she was placed under oath in 1983 or 1984.

Lambrix v. State, 39 So. 3d 260, 270-71 (Fla. 2010) (quoting state trial court order).

On October 23, 2003, three months after the state trial court denied Lambrix's claim, Hanzel wrote a letter to the state trial court (which she followed with an affidavit), informing the state trial court that she had not testified truthfully at the evidentiary hearing and that in fact Smith had convinced her to testify falsely at trial. The state trial court ordered another evidentiary hearing, which took place on February 9 and April 5, 2004, at which Hanzel testified, among other things, that Lambrix never told her he killed Bryant or Moore and that Smith told her Lambrix attacked Moore after Moore "went nuts." The state trial court again denied relief on Lambrix's Hanzel-recantation claim, finding again there was no credible evidence to support Lambrix's Hanzel-recantation claim:

> With regard to Deborah Hanzel, the Court is presented with a confused witness who made equivocating statements about testimony she gave with respect to a double homicide that occurred well over twenty years ago. As the Court previously ruled on July 9, 2003, Hanzel's testimony never met the legal requirements for a recantation.
> . . . .
> With regard to Claim II (the Hanzel recantation)[,] the Courts finds that

17

there is no credible evidence to support the Defendant's allegations. The Court stands by its ruling previously made on July 9, 2003, and nothing that the Court has heard since has caused it to reach a contrary conclusion. Claim II is, once again, DENIED.

On appeal, the Florida Supreme Court affirmed the Hanzel rulings. Lambrix v. State, 39 So. 3d 260, 270-73 (Fla. 2010). In doing so, the Florida Supreme Court noted that: (1) under Florida law, recanted testimony is "exceedingly unreliable," (2) the trial court in witness-recantation cases must examine the credibility of a recantation, and (3) the trial court's credibility determinations should be affirmed if supported by competent, substantial evidence. Id. at 272. After reviewing the record and the state trial court's findings, the Florida Supreme Court concluded there was competent, substantial evidence for the trial court's ruling. Id. The Florida Supreme Court pointed out that statements in Hanzel's affidavit most strongly supported Lambrix's recantation claim, but that when Hanzel was on the stand during the second evidentiary hearing, she "generally could not testify to those statements on her own" and needed to refer to the affidavit "to 'refresh' her recollection." Id.

The Florida Supreme Court also concluded that "even if Hanzel had not testified at trial that Lambrix stated he killed two people, the recantation would not be of such a nature that it would probably produce an acquittal on retrial" because

18

(1) "Hanzel never recanted her testimony that Lambrix offered to show her where two bodies were buried" and (2) "[e]ven without Hanzel's testimony, there would still be the testimony of [Preston] Branch that he heard Lambrix make statements similar to those to which Hanzel testified." Id. at 272-73 (quotation marks omitted).

To the extent Lambrix's current claim in his Application relies on the contention that Hanzel was an agent of the State and the State coerced Hanzel into testifying, it was already presented to the district court. To the extent Lambrix's current claim relies on one or more versions of Hanzel's recantation testimony from 1998 to 2004, we conclude Lambrix has shown neither (1) that the factual predicate of this claim could not have been discovered previously through the exercise of due diligence, nor (2) that the facts underlying his claim would establish by clear and convincing error that but for a constitutional violation, no reasonable factfinder would find Lambrix guilty of first-degree murder. Indeed, we agree with the Florida Supreme Court that recanted testimony 20 years later is "exceedingly unreliable" and the state trial court's rulings about Hanzel's memory and credibility are supported by the evidence. See In re Davis, 565 F.3d 810, 825 (11th Cir. 2009) (noting the established principle that "recantations are viewed with extreme suspicion by the courts").

19

**D. Claim 5: Conspiracy**

In Claim 5, Lambrix asserts that newly discovered evidence establishes the existence of a conspiracy between Frances Smith and the State to convict him of the murders of Moore and Bryant, which he did not commit. However, Lambrix fails to allege what evidence is new, when it was discovered, or how it could not have been discovered previously through the exercise of due diligence. Moreover, Lambrix offers no actual evidence of any conspiracy. Instead, Lambrix merely names possible participants and then purports to critique their trial testimony.[6] Lambrix has not made a prima facie showing as to either prong of § 2244(b)(2)(B) regarding Claims 5.

**E. Claim 9: Judicial Bias**

Claim 9 of Lambrix's Application alleges judicial bias on the part of the state trial judge for Lambrix's second trial. In support of Claim 9, Lambrix proffers no facts linking the alleged bias to Lambrix's own case. Instead, Lambrix relies on the fact the state trial judge was found to be biased in a <u>different</u> case,

---

[6]For example, Lambrix avers that because the State Attorney's Investigator Daniels was present for the victims' autopsy, the autopsy results were modified. But as purported support for this claim, Lambrix identifies only testimony from pathology experts that take issue with aspects of the medical examiner's investigation and opine that the medical examiner's testimony at trial was "of suspect reliability." There is no allegation that the medical examiner testified untruthfully, nor is there any allegation as to how, when, or by whom the autopsy results were changed.

20

Porter v. Singletary, 49 F.3d 1483 (11th Cir. 1995), and asserts that the trial judge's bias extends to all capital defendants, Lambrix included.

Lambrix brought this judicial bias claim in his 1998 successive state postconviction motion, three years after this Court's 1995 decision in Porter, even though Lambrix was represented at the time by the same counsel that represented Porter. The state courts rejected Lambrix's claim, concluding that Lambrix had brought forth no evidence the trial judge was biased in Lambrix's case. See Lambrix v. State, 39 So. 3d at 273-75.

As to Claim 9, we conclude that Lambrix has not made a prima facie showing as to either prong of § 2244(b)(2)(B).

## F.     Three Remaining Claims

Lambrix's remaining claims allege that: (1) the State violated Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), when it failed to reveal to the defense that the State's witness Frances Smith allegedly had a sexual relationship with the State Attorney's Investigator Robert Daniels ("Claim 3"); (2) the State violated Brady and Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1971), by failing to disclose that the tire iron used to kill Moore contained hairs that did not match the victims but were allegedly consistent with Smith's and by allegedly substituting a fake tire iron to be admitted against Lambrix at trial ("Claim 6");

21

and (3) he is actually innocent ("Claim 2").

As to Claim 3 about the alleged sexual relationship, the state trial court held an evidentiary hearing and determined, after evaluating the credibility of the witnesses, that no sexual relationship existed. See Lambrix v. State, 39 So. 3d 260, 266-68 (Fla. 2010). The Florida Supreme Court affirmed the state trial court's denial of state postconviction relief. Id. at 266-70. The Florida Supreme Court found "no basis in the record to reject the trial court's factual finding that no sexual encounter occurred between Smith and Daniels." Id. at 269.

The Florida Supreme Court also concluded that Lambrix could not in any event show that the allegedly suppressed evidence "was sufficient to undermine confidence in the outcome" of Lambrix's trial because: (1) the alleged one-time sexual encounter between Smith and Daniels could only have occurred during Lambrix's second trial, but Smith's statements during the investigation and the first trial were consistent with her second-trial testimony; (2) during the evidentiary hearing Smith reaffirmed her testimony inculpating Lambrix; and (3) even if Lambrix impeached Smith with evidence of her alleged sexual encounter with Daniels, "there is no basis to conclude that the jury would have disregarded or not found credible the substantial testimony Smith provided as to the facts of the murders." Id. at 269-70.

After reviewing the allegations in Claim 3, we conclude Lambrix has not shown that the factual predicate underlying Claim 3 could not have been discovered previously through due diligence, as required by § 2244(b)(2)(B)(i). Additionally, we conclude Lambrix has not made a prima facie showing under § 2244(b)(2)(B)(ii) that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii).

As to Claim 6 about the tire iron, the state trial court denied this claim, which Lambrix raised in his latest state successive postconviction motion on April 9, 2009. On July 19, 2010, the state trial court concluded that (1) Lambrix did not demonstrate that the records upon which the claim is based could not have been discovered previously through the exercise of due diligence, and (2) the untested hairs found on the tire iron did not exonerate Lambrix because they did not prove he was not the perpetrator or was not present at the crime scene.

Lambrix appealed the state trial court's denial of this tire iron claim, and his appeal is pending before the Florida Supreme Court. Lambrix v. State, No. SC10-1845 (Fla.) (appeal docketed Sept. 28, 2010). Therefore Lambrix has not yet

exhausted his state remedies as to this claim. See 28 U.S.C. § 2254(b)(1)(A) (providing that a writ of habeas corpus may not be granted to a state prisoner by a federal court unless "the applicant has exhausted the remedies available in the courts of the State"); Mason v. Allen, 605 F.3d 1114, 1119 (11th Cir. 2010) ("[T]o properly exhaust a claim, the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." (quotation marks and brackets omitted)).

In any event, Lambrix's own statements vitiate this tire iron claim. In his Application, Lambrix admits grabbing and handling the tire iron and hitting Moore with it. Even if the tire iron had hairs of another person, that does not contradict the trial evidence or exonerate Lambrix. Lambrix has established neither prong of § 2244(b)(2)(B).

As to Claim 2 alleging Lambrix's freestanding actual innocence claim, we note that Lambrix must overcome several significant hurdles at the outset, including whether a freestanding claim of actual innocence exists apart from any claim of constitutional error at trial and whether such a claim, even if it is cognizable, is the kind of claim that can be brought in a second or successive petition. See In re Davis, 565 F.3d 810, 816, 823-24 (11th Cir. 2009) (stating that "it is not clear at all under the case law whether . . . a freestanding actual

24

innocence claim . . . is viable on federal habeas corpus review," much less whether it is available to be raised in a second or successive petition). But we need not resolve these threshold issues, because even assuming Lambrix can make a freestanding actual innocence claim, the facts Lambrix proffers in support of this claim are the same facts alleged elsewhere in his Application: the alleged Smith/Daniels sexual relationship, the Hanzel recantation, the hairs on the tire iron that do not match Lambrix or the victims, etc. For the same reasons Lambrix has not satisfied the requirements of § 2244(b)(2)(B) as to his other claims, he likewise has not as to his actual innocence claim. See 28 U.S.C. § 2244(b)(2)(B)(ii) (requiring that the "facts underlying the claim" establish "by clear and convincing evidence" that no reasonable finder of fact would have found the applicant guilty).

Alternatively, even assuming freestanding actual innocence claims are cognizable, and even if § 2244(b)'s requirements were to have no application to actual innocence claims, Lambrix's purported facts fall far short of the type and quantity of evidence necessary to establish "a truly persuasive demonstration of 'actual innocence.'" Herrera v. Collins, 506 U.S. 390, 417, 113 S. Ct. 853, 869 (1993) (assuming, without deciding, "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of

the defendant unconstitutional," but stating that "the threshold showing for such an assumed right would necessarily be extraordinarily high").

## VI.  CONCLUSION

In sum, we conclude that as to all of his claims, Lambrix has failed to meet the requirements of § 2244(b)(2)(B) that the factual predicate for the claim could not have been discovered previously through the exercise of due diligence and that the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable jury would have found Lambrix guilty of the underlying murders.

Petitioner's Lambrix's Application for Leave to File a Second or Successive Habeas Corpus Petition, pursuant to 28 U.S.C. § 2244(b), is denied.  Petitioner's motion for appointment of counsel is denied.  Petitioner's motion to stay proceedings is denied.

**APPLICATION DENIED.**